# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 21-518V

| | |
|---|---|
| * * * * * * * * * * * * * | |
| ANGELA WESSINGER,       * | Chief Special Master Corcoran |
|                         * | |
| Petitioner,             * | |
|                         * | Dated: October 23, 2023 |
| v.                      * | |
|                         * | |
| SECRETARY OF HEALTH     * | |
| AND HUMAN SERVICES,     * | |
|                         * | |
| Respondent.             * | |
|                         * | |
| * * * * * * * * * * * * * | |

*Nancy Routh Meyers*, Turning Point Litigation, Greensboro, NC, for Petitioner.

*Emily H. Manoso*, U.S. Department of Justice, Washington, DC, for Respondent.

## AMENDED DECISION DISMISSING TABLE CLAIM[1]

On January 11, 2021, Angela Wessinger filed a petition seeking compensation under the National Vaccine Injury Compensation Program (the "Vaccine Program").[2] Petitioner alleges she suffered a left Shoulder Injury Related to Vaccine Administration ("SIRVA") following receipt of an influenza ("flu") vaccine on October 9, 2018. First Amended Petition (ECF No. 16) at 1, 11. The matter was originally assigned to the Special Processing Unit ("SPU"), but it was transferred to my regular docket because of the complexity of the fact issues presented.

Respondent has now moved to dismiss the Table claim, arguing that Petitioner cannot satisfy such a claim's elements, and Petitioner has opposed the motion. Motion, dated June 30, 2023 (ECF No. 29) ("Mot."); Opposition, dated Aug. 17, 2023 (ECF No. 31) ("Opp."). Based on

---

[1] Under Vaccine Rule 18(b), each party has fourteen (14) days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole Decision will be available to the public in its present form. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended at 42 U.S.C. §§ 300aa-10 through 34 (2012) ("Vaccine Act" or "the Act"). Individual section references hereafter will be to § 300aa of the Act (but will omit that statutory prefix).

review of the record and the parties' arguments, I hereby grant Respondent's motion, for the reasons discussed below.

I.    **Factual Background**

*Vaccination and Initial Medical Interventions*

Petitioner, a radiology technician, received a flu vaccine in her left deltoid on October 9, 2018, through her employer. Ex. 1 at 2. Nine days later, on October 18, 2018, she saw James M. Smith, M.D.—her primary care provider ("PCP"). Ex. 2 at 51. She complained of weakness and nausea after the vaccination, causing her to seek bedrest for three days. *Id.* Thereafter (but seven days prior to this encounter—hence around October 11th), she started to feel limb weakness and a radiating aching discomfort plus paresthesias and a chest "squeezing sensation"—all of which had begun "[a]bout 3 days after her vaccine." *Id.* Her range of motion ("ROM") does not appear to have been examined at this time. *Id.* at 52. Petitioner, however, has asserted that she felt immediate post-vaccination pain, and later records provide some support for this contention (as discussed below).

Dr. Smith speculated that Petitioner's symptoms could reflect a vaccine "side effect," although he also noted that "while she has some mild generalized weakness [,] it is not impressive." Ex. 2 at 53. Dr. Smith went on to consult with neurology specialists about Petitioner, and they allowed for the possibility of a vaccine association, but added that her "subsequent symptoms and physical exam [we]re more compatible with anxiety," and therefore electrodiagnostic testing or further follow-up with a neurologist was unnecessary at this time. *Id.* at 53. Petitioner was diagnosed with weakness and lab work was ordered. *Id.* at 52–53.

Petitioner returned to see her PCP for follow-up five days later, on October 23, 2018. Ex. 2 at 59. She now reported substantial improvement in her "arm discomfort," but still had "some weakness and vague paresthesias." *Id*. On exam, she revealed full motor strength and normal deep tendon reflexes, denied joint pain, and a musculoskeletal exam performed at this time was again notable only for the absence of edema. *Id.* at 59–60. Three days later, however (October 26, 2018), Petitioner saw Dr. Smith again, reporting difficulty with tasks involving lifting. Ex. 2 at 63. Petitioner also now maintained that her symptoms (in particular, arm pain) had started within 24 hours of vaccination. *Id*. A physical musculoskeletal exam once again only noted the absence of edema. *Id*. at 64. Dr. Smith expressed concern "about transverse myelitis and demyelinating diseases," and recommended further neurological work-up. *Id.* At the end of October, Petitioner underwent magnetic resonance imaging ("MRI") of her cervical spine with and without contrast, but the results were unrevealing. Ex. 2 at 152–53. A brain MRI performed the next day, on October 31, 2018, was also "essentially normal." Id. at 154.

2

On November 1, 2018, Petitioner first saw neurologist Virendra Ranadive, M.D. Ex. 9 at 39. She again reported onset of acute weakness closer in time to her vaccination (around 26 hours) than she had when she first saw Dr. Smith on October 18th. *Id*. Otherwise, she now maintained that her pain had gotten progressively worse, and that she was experiencing tingling and numbness in both her hands and feet, plus left arm pain "up to the shoulder" and in her "right foot up to the calf." *Id*. Dr. Ranadive's physical examination revealed normal tone and strength in both arms. Ex. 9 at 40. Petitioner was now diagnosed with Guillain-Barré syndrome ("GBS") and muscle weakness. *Id.*

The very next day, and after consulting with Dr. Ranadive, Petitioner sought emergency care at Piedmont Healthcare due to worsening leg pain and weakness. Ex. 3 at 6; Ex. 9 at 40. Petitioner again reported onset within a day of vaccination, although she emphasized neurologic symptoms or weakness over arm pain (although she did reference a headache and associated neck pain). Ex. 3 at 6. On exam, she displayed normal ROM, no edema, and no tenderness. Ex. 3 at 8. She also had no cranial nerve deficits, normal muscle tone, intact deep tendon reflexes, and had normal coordination. *Id*. And a CT of Petitioner's head, lumbar puncture, lumbar spinal MRI, and pelvic MRI all produced normal or unrevealing results. *Id*. at 10–11, 50–51, 53–54. In effect, none of the indicia of GBS were present, based at least on this exam and the testing and imaging, despite Petitioner's seemingly-neurologic symptoms complaints.

Despite the lack of an identifiable problem (outside of subjective complaints), Petitioner was admitted to the hospital for further evaluation. Ex. 3 at 12. At this time, Dr. Ranadive characterized Petitioner's condition as reflecting post-vaccination "myalgic symptoms." Ex. 3 at 21. During her hospitalization, Petitioner was also evaluated for physical and occupational therapy ("PT" and "OT"). She did not require any OT, but her PT evaluation revealed the need for bilateral arm support for balance, although she otherwise could carry out usual physical activities. *Id*. at 29–33. By November 5, 2018, she had been discharged, and the differential diagnosis mentioned generalized weakness, numbness, and acute cystitis without hematuria. *Id.* at 16.

Later that fall, Petitioner saw both Dr. Ranadive and her PCP, but she did not appear to report any left shoulder complaints (although she did indicate she was experiencing hands and feet parasthesias and leg weakness). *See* Ex. 9 at 35; Ex. 2 at 71. Dr. Smith continued to deem Petitioner to have experienced some form of "unspecified reaction to the flu vaccine," but noted there were "no objective findings on diagnostic studies or physical examination." Ex 2 at 72. Dr. Ranadive proposed that Petitioner had mononeuritis multiplex, a syndrome of neuromuscular or neurological symptoms. Ex. 9 at 30. Additional imaging and nerve conduction studies revealed no aberrant results. Ex. 9 at 28, 30–33.

*2019 Treatment*

In January 2019, Petitioner saw Drs. Ranadive and Smith for follow-up visits, complaining of limb weakness and numbness rather than the kind of focal shoulder pain specific to SIRVA. Ex. 9 at 25; Ex. 2 at 75. Dr. Smith continued to speculate that she had experienced some vaccine-related adverse effect. Ex. 2 at 76. And while Petitioner was still complaining of neurologic issues into the spring of that year, she did not similarly report shoulder pain—and no other explanations were provided for her overall presentation. *Id* at 79–80; Ex. 9 at 22.

By April 2019, Petitioner had begun PT, and she maintained her symptoms were vaccine-related and were impacting her ability to perform certain aspects of her job. Ex. 4 at 2–4, 8. But she displayed on examination intact reflexes with mild motor weakness. *Id*. at 6–7. She pursued PT into May, and did complain of left shoulder pain in this time, although inconsistently and not only in her vaccinated shoulder, and she did not otherwise connect these symptoms to the fall 2018 vaccination. *See generally* Ex. 4 at 2–32. On the contrary, she informed other treaters around this time that her vaccine-associated injury was GBS. Ex. 10 at 15. Dr. Smith echoed that contention in a record from June 2019, at a wellness visit. Ex. 2 at 83.

Petitioner attended more PT sessions through September 2019, although by the time the PT course ended her strength and left shoulder rotation had regressed. Ex. 4 at 54. The physical therapist thought both issues could be due to continued pain. *Id*. That same summer, Petitioner complained of left deltoid pain to a different neurologist, and was later diagnosed with left deltoid bursitis by Dr. Smith. Ex. 10 at 11; Ex. 2 at 87–88.

On September 30, 2019, Petitioner had an initial consult with orthopedist Susan Jordan, M.D., at Piedmont OrthoAtlanta as part of a worker's compensation claim. Ex. 5 at 4. She now specifically complained of left shoulder pain that she asserted began after her October 2018 vaccination. *Id*. at 5. Dr. Jordan wrote that Petitioner "had this flu shot and immediately developed shoulder pain." *Id*. On exam, Petitioner's pain was worse with overhead activity and reaching across her body, but she was working without restrictions. *Id*. at 6. An MRI was recommended to screen for any underlying structural problem, although Dr. Jordan thought it unlikely vaccination was capable of producing such an injury. *Id*.

A day later—and now nearly a year after the vaccination at issue—Petitioner returned to Dr. Ranadive, complaining of left arm pain. Ex. 9 at 19. He ordered a left shoulder MRI for the reported pain and recommended Petitioner not receive a flu shot that year. *Id.* at 20. That same October, Petitioner visited a different orthopedist at Piedmont OrthoAtlanta, Michael McHenry, M.D., complaining of "forearm pain," which she linked to the October 2018 vaccine. Ex. 5 at 8. The exam only revealed that her left shoulder had some decreased flexion and abduction compared to her right, and she was diagnosed with left shoulder impingement related to the vaccine, with

4

another MRI recommended. *Id*. at 9. The MRI, however, revealed little, and at most led to Petitioner being diagnosed with supraspinatus, infraspinatus, and subscapularis tendinosis. Ex. 5 at 3.

Further neurologic exams, or visits with Dr. Smith, in October 2019 resulted in normal exam findings. Ex. 10 at 9–10; Ex. 2 at 91–92. The only other left shoulder-specific treatment visit for that year is from December, when Petitioner visited yet another orthopedics practice on December 19, 2019. Ex. 6 at 20–21 (emphasis in original). At this time, Petitioner received a corticosteroid injection in her left shoulder, but denied relief from it, and the treater who saw her speculated that her lack of response "would infer that this is an intra-articular inflammation rather than bursal inflammation. She does not have frozen shoulder." *Id.*

*2020 Treatment and Thereafter*

Many additional medical records have been filed detailing Petitioner's efforts to obtain treatment for her alleged post-vaccination condition, but they shed little light on the questions before me regarding Petitioner's SIRVA Table claim. At most, there is *some* evidence from this timeframe (now fifteen or more months post-vaccination) that is supportive of the claim, but which does not at the same time undermine *the lack* of more immediate, contemporaneous evidence (as discussed above) that is inconsistent with SIRVA.

During the winter and early spring of 2020, Petitioner obtained additional PT for left shoulder stiffness. Ex. 6 at 43; *see also* Ex. 8 at 66. But her symptoms were attributed to her alleged vaccine-related GBS, and by the time Petitioner ceased this round of PT in March, she deemed her condition improved, with little pain. Ex. 8 at 65–66. That same winter, she sought neurologic treatment for fatigue/numbness/limb tingling. Ex. 9 at 13. Although she did also report some existing shoulder pain as well, the thrust of her treatment was specific to her purported vaccine-induced GBS. Ex. 11 at 9–10, 13. At later treatment visits that March with Drs. Smith and Ranadive, shoulder pain complaints were not raised. *See, e.g.*, Ex. 2 at 101; Ex. 9 at 10–11.

That summer, Petitioner obtained additional orthopedic treatment for left shoulder issues. Ex. 6 at 14. Although she was deemed to have improved, and reported little discomfort, the need for surgery was dismissed. *Id.* at 15–16. However, an orthopedic treater did propose at this time "within a degree of medical certainty" that her left shoulder pain was vaccine-caused. *Id*. at 16 (emphasis added). Later that summer, it appears Petitioner experienced a hiking accident that resulted in her pursuit of more PT, but the relevant records suggest only concerns with GBS sequela rather than left shoulder pain due to a vaccine misadministration. Ex. 8 at 11, 42, 59. (Significantly, from the filed records it does not appear that Petitioner sought or obtained more neurologic treatment after the fall of 2020).

5

In early 2021, Petitioner again sought orthopedic assistance for recent-onset (three to four months before) left arm soreness. Ex. 15 at 47. She now received a second corticosteroid injection. *Id.* at 62. After this point, there are more records directly addressing a putative connection between the October 2018 vaccination and Petitioner's shoulder pain reports (although the fact that the relevant records reflect treatment sought *after* the claim's initiation is a basis for giving them somewhat less weight than the records from the two-plus years before).

Thus, Petitioner visited an orthopedist in the winter of 2021, reporting ROM limits and "constant discomfort." Ex. 15 at 38, 57. The treater, however, deemed Petitioner's presentation "not a classic frozen shoulder," adding that she was not likely a good surgery candidate based on existing MRI findings (although he administered another steroid injection at this time). *Id.* at 59. About six months later, the same orthopedist saw Petitioner again in July 2021, noting that the steroid shots had not been effective; the orthopedist could not recommend surgery, however, since the cause of Petitioner's pain complaints had not been identified. *Id.* at 58.

Petitioner obtained yet another left shoulder MRI in September 2021 (now almost three years post-vaccination). Ex. 15 at 63. This time, although the imaging revealed no rotator cuff tears, she did display mild tendinopathy throughout her distal rotator cuff tendons and intra-articular biceps tendon, plus a tear at the base of the superior labrum. *Compare* Ex. 15 at 63 (September 22, 2021 MRI) *with* Ex. 5 at 3 (October 15, 2019 MRI of left shoulder which showed no muscle atrophy, no labral tears, and no full thickness tear, and noted only mild acromioclavicular degenerative changes and hypertrophy). Based on these newer/updated findings, an orthopedist deemed surgery a reasonable option. Ex. 15 at 53–54.

In November 2021, Petitioner underwent a procedure—a left shoulder arthroscopic acromioplasty, distal clavicle resection, and biceps tenodesis. Ex. 15 at 34–36, 47. Her post operative diagnoses were left shoulder impingement syndrome, left acromioclavicular arthrosis, and a left shoulder superior labral tear. *Id.* Petitioner thereafter reported improvement (at least initially), although by the winter of 2022 she was experiencing soreness after over-exertion, and some lingering stiffness. Ex. 15 at 41, 43–44, 48.

## II.     Procedural History

After the case's initiation in January 2021, it was assigned to SPU, since it asserts a SIRVA claim—a kind of vaccine injury that routinely results in settlement or other prompt resolution. (Petitioner also proposed, in the alternative, that she had experienced some kind of neurologic injury, such as GBS). However, Respondent's Rule 4(c) Report, filed in February 2022, argued that there was not a preponderance of evidence demonstrating the requisite facts necessary to establish a Table SIRVA injury (particularly with respect to the 48-hour onset element). ECF No. 20. The matter was thereafter transferred out of SPU to my docket.

I afforded Petitioner the chance to obtain expert support for her neurologic causation claim, but she filed a second amended petition in April 2023, now expressly limiting her claim to facts specific to a SIRVA injury. She thus abandoned a causation claim alleging a neurologic injury (although she did maintain, in the alternative to her SIRVA Table claim, a causation claim based on a SIRVA-like injury). Second Amended Petition (ECF No. 27) at 7 (¶ 36), 8; Status Report, dated Apr. 27, 2023 (ECF No. 28) at 1–2. I thereafter set a schedule for briefing the disposition of the Table claim via ruling on the record, the parties filed their respective briefs, and the matter is ripe for resolution.

### III.    Parties' Arguments

Respondent requests dismissal of the Table SIRVA claim. Mot. at 2. He contends in particular that the requirement of no other "condition or abnormality" for the injury can be met, since the record is replete with evidence that Petitioner was contending with a variety of neurologic-in-character symptoms and issues distinguishable from a SIRVA (and that likely explain Petitioner's condition overall). *Id.* at 18–20. Further, Respondent maintains that Petitioner cannot demonstrate pain or ROM issues specific to her shoulder, given all the evidence of complaints about problems elsewhere in her body. *Id.* at 20–21. Nor, in Respondent's estimation, can two-day onset of pain be established (even though he concedes this presents a "convoluted" question). *Id.* at 21. Record evidence reveals instances in which Petitioner reported onset outside the Table timeframe, with her claims of shorter onset being specific to distinguishable neurologic problems. *Id.* at 22. Petitioner only began consistently claiming pain within 48 hours of vaccination a year later. *Id.* at 23.

Petitioner acknowledges the existence of evidence suggesting she had experienced some kind of neurologic post-vaccination illness or condition, but emphasizes that she is no longer asserting any claim for compensation based on such neurologic injury. Opp. at 9. Rather, she only alleges a SIRVA—and maintains that she could successfully establish its elements regardless of concurrent neurologic issues. *Id.* at 9–11 (citations omitted). At least one October 2018 record, for example, confirmed onset within a day of vaccination, and treater records from the following year consistently reported proper onset. *Id.* at 12–13. The evidence of radiating pain does not prevent a favorable SIRVA determination, since there was evidence of shoulder-specific issues, and therefore complaints about pain elsewhere can be distinguished. *Id.* at 13–14. And Petitioner's symptoms existed for more than six months post-vaccination. *Id.* at 14–15. In addition, Petitioner observes the many instances in which treaters confirmed or opined that her symptoms were vaccine-caused. *Id.* at 11–12.

## IV.     Applicable Legal Standards

### A.     *Petitioner's Overall Burden in Vaccine Program Cases*

To receive compensation in the Vaccine Program, a petitioner must prove either: (1) that he suffered a "Table Injury"—i.e., an injury falling within the Vaccine Injury Table—corresponding to one of the vaccinations in question within a statutorily prescribed period of time or, in the alternative, (2) that his illnesses were actually caused by a vaccine (a "Non-Table Injury"). *See* Sections 13(a)(1)(A), 11(c)(1), and 14(a), as amended by 42 C.F.R. § 100.3; § 11(c)(1)(C)(ii)(I); *see also Moberly v. Sec'y of Health & Hum. Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Hum. Servs.*, 440 F.3d 1317, 1320 (Fed. Cir. 2006).[3] Petitioner herein *primarily* alleges a Table SIRVA claim (although she maintains the same operative facts could support a non-Table claim as well).

For both Table and Non-Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof. Section 13(1)(a). That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly*, 592 F.3d at 1322 n.2; *see also Snowbank Enter. v. United States*, 6 Cl. Ct. 476, 486 (1984) (mere conjecture or speculation is insufficient under a preponderance standard). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Hum. Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991). In particular, a petitioner must demonstrate that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321 (quoting *Shyface v. Sec'y of Health & Hum. Servs.*, 165 F.3d 1344, 1352–53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Hum. Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). A petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. Section 13(a)(1).

### B.     *Evidentiary Considerations Specific to Table SIRVA Claims*

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu

---

[3] Decisions of special masters (some of which I reference in this ruling) constitute persuasive but not binding authority. *Hanlon v. Sec'y of Health & Hum. Servs.*, 40 Fed. Cl. 625, 630 (1998). By contrast, Federal Circuit rulings concerning legal issues are binding on special masters. *Guillory v. Sec'y of Health & Hum. Servs.*, 59 Fed. Cl. 121, 124 (2003), *aff'd* 104 F. App'x. 712 (Fed. Cir. 2004); *see also Spooner v. Sec'y of Health & Hum. Servs.*, No. 13-159V, 2014 WL 504728, at *7 n.12 (Fed. Cl. Spec. Mstr. Jan. 16, 2014).

vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:
>
> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
> (ii) Pain occurs within the specified time-frame;
>
> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g*. NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

      C.    *Legal Standards Governing Factual Determinations*

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. Section 11(c)(2). The special master is required to consider "all [ ] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as the "results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." Section 13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Hum. Servs*., 3 F.3d 415, 417 (Fed. Cir. 1993) (determining that it is within the special master's discretion to determine whether to afford

greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is evidenced by a rational determination).

As noted by the Federal Circuit, "[m]edical records, in general, warrant consideration as trustworthy evidence." *Cucuras*, 993 F.2d at 1528; *Doe/70 v. Sec'y of Health & Hum. Servs.*, 95 Fed. Cl. 598, 608 (2010) ("[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical records was rational and consistent with applicable law"), *aff'd*, *Rickett v. Sec'y of Health & Hum. Servs.*, 468 F. App'x 952 (Fed. Cir. 2011) (non-precedential opinion). A series of linked propositions explains why such records deserve some weight: (i) sick people visit medical professionals; (ii) sick people attempt to honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in as accurate a manner as possible, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Hum. Servs.*, No. 11–685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013); *Cucuras v. Sec'y of Health & Hum. Servs.*, 26 Cl. Ct. 537, 543 (1992), *aff'd*, 993 F.2d at 1525 (Fed. Cir. 1993) ("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms").

Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03–1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). Indeed, contemporaneous medical records are often found to be deserving of greater evidentiary weight than oral testimony—especially where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Hum. Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992), *cert. den'd*, *Murphy v. Sullivan*, 506 U.S. 974 (1992) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947) ("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.")).

However, the Federal Circuit has also noted that there is no formal "presumption" that records are accurate or superior on their face to other forms of evidence. *Kirby v. Sec'y of Health & Hum. Servs.,* 997 F.3d 1378, 1383 (Fed. Cir. 2021). There are certainly situations in which compelling oral or written testimony (provided in the form of an affidavit or declaration) may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Hum. Servs.*, 69 Fed. Cl. 775, 779 (2006) ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475, at *19 ("[w]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent") (quoting *Murphy*, 23 Cl. Ct. at 733)).

10

Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded. *Andreu*, 569 F.3d at 1379; *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

When witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez*, 2013 WL 1880825, at *3 (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203–04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). In making a determination regarding whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at hearing, there must be evidence that this decision was the result of a rational determination. *Burns*, 3 F.3d at 417.

## ANALYSIS

After review of the records and the parties' arguments, I find that Petitioner can only preponderantly meet the 48-hour onset element for a SIRVA Table claim. Although the first temporal record clearly identifies an onset outside the relevant timeframe, numerous subsequent records reference pain occurring within the appropriate two-day timeframe (although other unrelated neurologic complaints are also reported for the same initial timeframe). *See, e.g.*, Ex. 9 at 39; Ex. 3 at 6. A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id*.

However, and as Respondent has established, Petitioner cannot otherwise establish a Table SIRVA based upon her medical record. In particular, Petitioner cannot preponderantly show that "[n]o other condition or abnormality is present that would explain the patient's symptoms." The tenor of Petitioner's symptoms is simply inconsistent with the persistent, shoulder-specific pain common to a SIRVA. Rather, the evidence preponderates in favor of the finding that Petitioner's symptoms were broader and more neurologic in character. Her most immediate symptoms involved weakness or feelings of discomfort. Ex. 2 at 51–53, 63. Treaters initially were concerned

about possible neurologic demyelinating injuries. *Id.* at 63, 152–53. She primarily saw neurologists as a result. Ex. 9 at 39-40. The conclusion from her November 2018 hospitalization was that she was experiencing weakness or numbness, without significant reports of the kind of pain associated with SIRVA. Ex. 3 at 16, 29–33. And this continued to be the case into the first half of 2019. Shoulder pain itself was not consistently complained of by Petitioner to treaters over time. Ex. 2 at 51, 59; Ex. 3 at 6. Indeed, she only saw an orthopedist in late September 2019 (now almost a year post-vaccination), but even thereafter continued to seek neurologic assistance. Ex. 5 at 4–5, Ex. 9 at 19.

This is also not a case in which I can distinguish pain complained of as occurring elsewhere in the body, relegating it to damages considerations while focusing on the evidence establishing shoulder pain. Rather, there is simply too much evidence about overall neurologic concerns to consider this case to present a SIRVA, since the fourth Table element affirmatively requires Petitioners to *differentiate* other evidence that makes it less likely vaccine administration caused the SIRVA.[4] It is more likely than not that Petitioner's intermittent complaints about shoulder or arm pain were secondary to her neurologic concerns—not independent from.

Of course, Petitioner's argument that a SIRVA *could* exist, concurrent with separate health problems (neurologic or otherwise) is accurate and reasonable. Her case citations reference circumstances in which the elements of a SIRVA appeared present despite the existence of comorbid health concerns, and it is otherwise fully conceivable that a claimant could experience both a SIRVA and some other injury simultaneously. But *this case's record* does not at all support that finding. The evidence of SIRVA in this case is simply insufficiently robust to meet the Act's preponderant standard (which applies to Table and non-Table claims equally). This record overwhelmingly suggests that the Petitioner *reported and experienced neurologic symptoms*, not a SIRVA.

In many cases, dismissal of a Table SIRVA claim would not end the proceedings, since the record could still support a causation-in-fact claim. Here, the record contains ample evidence of a potentially vaccine-associated injury more neurologic in character. But Petitioner dismissed her neurologic claim due to the inability to obtain expert input on the matter. *See* Opp. at 9. And although she has alleged, in the alternative, a causation claim based on the evidence relied upon

---

[4] This highlights a relevant distinction between a causation-in-fact claim and Table SIRVA. Ordinarily, claimants asserting a non-Table claim need not affirmatively establish the absence of an alternative cause explanation (although such evidence does bear on whether a petitioner can show a vaccine likely "did cause" an injury). But the need to demonstrate *no* potential "other condition or abnormality" is a *self-evident, plain element* of a Table SIRVA claim—and it cannot be met where, as here, the record is replete with evidence of a different condition or abnormality that could explain shoulder pain.

for her Table SIRVA, such a claim would not be viable, for many of the same reasons discussed above.[5] Accordingly, dismissal of the case in its entirety is warranted.

## CONCLUSION

Because I find (based on the entire record in this case) that Petitioner has not carried her burden of proof for the claims she alleges, I **GRANT** Respondent's Motion to Dismiss the Petition.

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court **SHALL ENTER JUDGMENT** in accordance with the terms of this Decision.[6]

**IT IS SO ORDERED.**

/s/ Brian H. Corcoran
Brian H. Corcoran
Chief Special Master

---

[5] Thus, I cannot find on this record that a vaccine administration-related injury occurred, even if Petitioner's pain began close-in-time to vaccination, since the tenor of the record strongly suggests an alternative explanation for that pain. I also note that Petitioner would have required expert support to substantiate such a causation claim, but has not offered it. And in amending the present Decision, I expressed the willingness to evaluate more fully whether a causation SIRVA could be established, but Petitioner affirmatively requested only that I formally acknowledge on the record that she had alleged a non-Table SIRVA—as the current version of the Decision does. *See* Status Report, dated October 20, 2023 (ECF No. 33); Order Withdrawing Decision, dated October 23, 2023 (ECF No. 34).

[6] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment if (jointly or separately) they file notices renouncing their right to seek review.